**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SAM WESLEY, JR., | No. C 08-5035 SI (PR) |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| MICHAEL SAYRE, et al., | |
| Defendants. / | |

## INTRODUCTION

This is a federal civil rights action filed by a pro se state prisoner pursuant to 42 U.S.C. § 1983. Defendants, employees of Pelican Bay State Prison ("PBSP"), move for summary judgment on grounds that there are no triable issues of fact and that they are entitled to summary judgment as a matter of law. (Defs.' Mot. for Summ. J. ("MSJ") at 3.) For the reasons set forth below, defendants' motion is GRANTED. Judgment will be entered in favor of defendants. Plaintiff shall take nothing by way of complaint.

//
//
//
//

**BACKGROUND**

The following facts appear to be undisputed except as noted. Plaintiff alleges that defendants provided constitutionally inadequate medical care for his chronic pain in violation of the Eighth Amendment. From April 2007 until April 2008, plaintiff was incarcerated at Martinez Detention Facility. While there, plaintiff was prescribed methadone as treatment for chronic pain. In April 2008, he was transferred to San Quentin State Prison. He was continued on his previous methadone prescription for chronic pain while at Martinez Detention Facility and San Quentin. (Pl.'s Opp. Mot. Summ. J. ("Opp."), Decl. Lynne G. Stocker ("Decl. Stocker"), Ex. A at 2.) On May 13, 2008 plaintiff was transferred to PBSP and remained there until he was paroled July 11, 2009. (Id. at 3.) Plaintiff's allegations concern medical treatment he received by the following defendants.

**I.     Treatment by Defendant Williams**

When transferred to PBSP on May 13, 2008, plaintiff was placed in the infirmary and was taken off methadone by Dr. Claire Williams. Plaintiff alleges that he went through painful withdrawals and was put on Tylenol #3 (Tylenol with Codeine) to be taken every six hours for about two weeks as an alternative to the methadone. (Compl. at 3.)

**II.    Treatment by Defendant Skinner**

Plaintiff alleges that Shery Skinner prescribed insufficient pain medication for his pain. (Compl. at 3.) The parties do not dispute the treatment plaintiff received from Skinner; they only dispute the effectiveness of that treatment. On June 12, 2008 plaintiff's Tylenol #3 prescription was temporarily set at one tablet a day by Skinner, a family nurse practitioner. (Id.) Defendant Skinner prescribed the Tylenol #3 for seven days until amitriptyline (Elavil), another pain reliever, became effective. (MSJ, Decl. Stocker, Ex. B at 170.)[1] At the same time, Skinner also

---

[1] The cited page numbers for Exhibit B refer to the handwritten numbers in the bottom right-hand corner of each page.

1 prescribed Clonindine for plaintiff's high blood pressure. (Id.) According to the medical
2 records, in one of his medical appeals, plaintiff was granted a change in medical care. At this
3 point, Skinner added Tylenol #3 while continuing the previous levels of amitriptyline. Plaintiff's
4 medical case was also submitted for case review to determine if a neurology consult was needed.
5 (Id. at 27.) On August 13, plaintiff was seen by Skinner. Plaintiff reported severe pain and
6 stated that the Tylenol #3 and amitriptyline was not enough to manage the pain; plaintiff then
7 requested an increase in the amitriptyline or the Tylenol #3. (Id. at 143.) Also on August 13,
8 plaintiff was sent to Sutter Coast Hospital for an MRI of his cervical spine due to his claims of
9 chronic head and neck pain. The radiologist's impression was that plaintiff had degenerative
10 disc disease, no focal disc protrusions, and no cord injury. (Id. at 213–14.)

11 It is undisputed that plaintiff was prescribed amitriptyline during part of his stay at PBSP.
12 Contrary to defendant's assertion, plaintiff contends that amitriptyline "is not a pain reliever.
13 That — what amitriptyline is prescribed for is it's a mild depressant. It's — but some doctors
14 seem to think that it's useful in the treatment of chronic pain." (MSJ, Decl. Stocker, Ex. A at
15 76–77.) Because he believed it not to be a pain reliever, plaintiff sometimes did not take it. (Id.
16 at 77.)

17

18 **III.    Treatment by Defendant Murray**

19 Plaintiff alleges that in June and July 2008 he was "denied any medical treatment by
20 Charles Murray, [r]egistered [n]urse, for disabling pain." (Compl. at 3.)

21 Defendants report, and plaintiff does not dispute, that on June 12, 2008 plaintiff was
22 given trigger point injections to his neck area to alleviate reported pain. After treatment, plaintiff
23 asserted feeling "much better." (MSJ, Decl. Stocker, Ex. B at 170.) As described earlier,
24 plaintiff was also prescribed amitriptyline and continued on Tylenol #3 by defendant Skinner
25 on that date.

26 Plaintiff alleges that he was denied medical treatment by Murray on June 23. (Compl. at
27 3.) Murray disputes this and says that plaintiff was advised by Murray that he had an upcoming
28

3

appointment with his primary care provider. (Id. at 161.) On June 25th, plaintiff was seen by defendant Murray for a nursing evaluation. Plaintiff complained of chronic pain and explained that he had previously been on methadone but that he was no longer allowed it. Defendant Murray wrote on plaintiff's medical chart that he observed plaintiff sitting on a bench facing away and when defendant Murray called plaintiff's name, plaintiff turned his head to look over his shoulder, had no facial grimace or tightness while rising without hand support, fluidly ambulated to the door, sat through the interview without obvious pain, placed and later grabbed coat from overhead hook, and flung medical door open with one push then proceeded to ambulate out in an almost marching or stomping fashion. (Id. at 158.) Plaintiff denies this and says that defendant Murray "never observed me sitting in bleachers facing away from him. His reports are totally without merits." (Opp. at 6.) In addition, plaintiff denies that Murray ever saw plaintiff not in pain. (Id.)

On July 1, Murray observed plaintiff during a ten to fifteen minute visit where there was no visual evidence of pain. (MSJ, Decl. Stocker, Ex. B at 156.) Plaintiff presented with complaints of chronic pain and once again threatened Murray with a lawsuit if methadone were not provided. Murray informed plaintiff that he was unable to proscribe the narcotics plaintiff desired. (Id.) Plaintiff denies asking Murray for medication, and instead says that he asked Murray "to schedule me to see a primary care physician." (Id., Ex. A at 80.) On July 1, Murray noted plaintiff's elevated blood pressure and informed plaintiff that he had a call into the primary care physician and was awaiting a call back. (Id., Ex. B at 154.) Plaintiff asserts that Murray denied him medical treatment on July 2, 2008; however, plaintiff does not provide evidence of, nor is the court aware of, any medical visit on that date. Presumably plaintiff was referencing the July 1 visit.

**IV.  Treatment by Defendant Cross**

Plaintiff alleges that he was denied medical care by J. Cross, a registered nurse, on September 5, 2008. (Compl. at 3.) The parties due not dispute that plaintiff presented with

4

severe neck and headache pain and wanted to be seen by a medical professional as soon as possible. The vitals taken showed hypertension and plaintiff's medications were reviewed by Cross. Plaintiff was given his daily dose of blood pressure medication, which he had not taken at that point, and his blood pressure was taken again, for a total of four times on September 5. After his blood pressure appeared to be normalizing at the end of the day, plaintiff was released and orders were given to recheck his blood pressure five days later. (MSJ, Decl. Stocker, Ex. B at 136.) Plaintiff contends this was not the proper medical treatment because he was taken to the hospital the next day for further treatment. (Opp. at 6.)

According to the defendants, and undisputed by plaintiff, as of September 6, 2008 plaintiff was generally taking amlodipine and hydrochlorothiazide for his blood pressure. (MSJ, Decl. Stocker, Ex. B at 233.) That morning, because his blood pressure was elevated, plaintiff received "clonidine 0.2 mg in the morning and 0.2 mg approximately 1700." (Id.) Because plaintiff's blood pressure remained high, he was brought into urgent care via ambulance to Sutter Coast Hospital where he received another 0.2 mg of clonidine. (Id.) The urgent care physician recommended steps to decrease plaintiff's blood pressure and recommended that plaintiff's primary care physician "consider increasing Tylenol #3 for better pain management." (Id. at 236.)

As discussed earlier, it is undisputed that plaintiff often refused to take his prescribed medication, including the pain medication amitriptyline. One such date when plaintiff was documented as refusing to take amitriptyline was September 17, 2008 as it was being distributed by Cross.[2] (Opp. Ex. A at 21.)

---

[2] Although not included in the pleadings, plaintiff did file a complaint against defendant Cross while at PBSP for his "discriminatory attitude of people of color." (Opp., Ex. A at 18.) Plaintiff alleges that Cross failed to dispense the amitriptyline in a respectful manner. Id. Cross reported that plaintiff refused to take amitriptyline as ordered and that when plaintiff became verbally abusive Cross asked plaintiff to leave the area and proceeded to shut the window. (Id. at 21.) Even if plaintiff had properly brought this racial discrimination claim, there is no issue of material fact as plaintiff provides no evidence of racial discrimination from Cross and such a claim is dismissed as facially insufficient.

## V.    Treatment by Defendant Sayre

Plaintiff alleges that Michael Sayer, the chief medical officer at PBSP denied him medical treatment and transfer back to San Quentin where plaintiff could have access to methadone. (Compl. at 3.)  It is undisputed that Sayre never saw nor treated plaintiff and acted only in an administrative role in plaintiff's health care while at PBSP.  Neither party disputes that in a July 29, 2008 letter, defendant Sayre partially granted one of plaintiff's appeals, as plaintiff's primary care provider had prescribed medication, but denied transfer to San Quentin State Prison. (Opp., Exh. A at 42.)  Plaintiff appealed again, and Sayre's holding was upheld on the second level of appeal on August 28, 2008.  (Id. at 43–44.)  Plaintiff then appealed to the administrative level, the final level of appeal, but the issue was dismissed as of July 23, 2009 as plaintiff had already been paroled and the Office of Third Level Appeals no longer had jurisdiction.  (Id. at 40.)

It is further undisputed that in a December 11, 2008 letter defendant Sayre partially granted another one of plaintiff's appeals for changed medical treatment. (Opp., Ex. A at 49.) Plaintiff requested that his prescription for Tylenol #3 be changed to a long-lasting pain medication. (Id.)  Defendant Sayre partially granted the appeal as plaintiff's Tylenol #3 was increased on November 10, 2008 and Clonidine was increased on November 12.  (Id.)

Neither party disputes that plaintiff asked for a continuance of his Tylenol #3 forty-five days beyond his parole date of July 11, 2009.  PBSP's pharmacy does not grant continuances unless one is ordered by an inmate's primary care provider.  Plaintiff was seen by James Flowers, a nurse, where Flowers observed that plaintiff ambulated with "no limping, no guarding, and no other signs of pain."  (MSJ, Decl. Stocker, Ex. B at 50.)  When denied a continuance, plaintiff stated that "I will just add this to my other lawsuits." (Id.)  In an April 27, 2009 letter, Sayre partially granted plaintiff's appeal seeking an adjustment in pain medication, a 30-day supply of pain medication once paroled, or alternatively transfer back to San Quentin State Prison. (Opp., Ex. A at 9.)  Sayre determined that plaintiff would receive a 30-day supply of any essential medications, but denied an increase in pain medication or a transfer.  (Id.)

6

**VI.     Other Medical Treatment**

Plaintiff alleged no further claims beyond the treatment described above; however, the medical staff at PBSP took additional actions and made further recommendations to treat plaintiff's pain. Descriptions of these further treatments follow.

Two days after arriving, May 15, 2008 at PBSP and in response to plaintiff's complaints of pain, x-rays were taken of his hips, lumbar spine, pelvis, knees, cervical spine and right shoulder. (MSJ, Decl. Stocker, Ex. B at 216–18.)

On June 11, 2008 plaintiff refused a laboratory blood draw for the purpose of completing a comprehensive metabolic panel and checking for lipids. (Id. at 143.)

On August 28, 2008 plaintiff saw Dr. Caroline Capitano, a pain specialist at PBSP, for evaluation of his neck pain. However, as Capitano notes, plaintiff was a "reluctant historian" and "refuse[d] to answer some questions" and therefore "the evaluation [was] somewhat compromised." (Id. at 140.) Capitano diagnosed plaintiff as having "significant suffering associated with mild cervical disease" where much of the pain "can be related to poor posture" and recommended physical therapy for plaintiff. (Id. at 141.) Plaintiff attended two of these physical therapy sessions then refused to return for further physical therapy. (Id., Decl. Stocker, Ex. A at 83–84.)

On November 11, 2008 plaintiff's prescription for Tylenol #3 was increased to two tablets per day and plaintiff was to continue on amitriptyline. (Id., Decl. Stocker, Ex. B at 100.)

On March 6, 2009 plaintiff asked to be seen by a medical doctor instead of a family nurse practitioner. (Id. at 63.) During the nursing evaluation, plaintiff was observed by Jose Bales, a registered nurse, to be alert, ambulatory, have a steady gait with no limping or guarding noted, and not be in any pain or discomfort. (Id.) Plaintiff was told that there was no guarantee he could see a doctor, because defendant Sayre had previously set up the primary care provide schedule; however, plaintiff was informed that if Dr. Rowe were to be available, then plaintiff would be placed in line to see her. (Id. at 65.)

7

On March 15, 2009 plaintiff was seen by Dr. Rowe and asked for an increase in pain medications. Plaintiff reports that Dr. Rowe told him that for any adjustment of pain medications he would have to be housed in the infirmary ("CTC"). (Opp., Ex. A at 61; MSJ, Decl. Stocker, Ex. A at 62.) Plaintiff told Dr. Rowe that he did not want to go to the CTC because he felt that it was punishment and it was isolating. (MSJ, Decl. Stocker, Ex. A at 62.) While plaintiff did tell Dr. Rowe he did not want to go to the CTC, as discussed above he believes that defendant Cross and defendant Murray displayed deliberate indifference by not sending him to the CTC at different times. (Id.)

On March 22, 2009 plaintiff filed an appeal of Dr. Rowe's decision to not increase his pain medications on March 15. Plaintiff sought either transfer to San Quentin State Prison or increased pain medicine. (Opp., Ex. A at 61.) This was the same basic issue on appeal as had previously been filed by plaintiff that led to two sessions of physical therapy before plaintiff refused further treatment and the appointment with Dr. Capitano, the pain specialist. On April 4, Dr. Rowe saw plaintiff. Dr. Rowe reported that plaintiff was "very noncompliant" with his blood pressure medications, leaving his blood pressure generally uncontrolled. (MSJ, Decl. Stocker, Ex. B at 52.) Dr. Rowe also reported that plaintiff was "very angry and hostile," "refused to listen and overtalked" her saying that the medical staff "do not know his case or how to properly treat him," and "left before any further conversation could be had or for any exam to [be] performed." (Id.) Dr. Rowe denied plaintiff's appeal for the same reasons the previous appeals had failed: plaintiff's "degree of chronic pain [did] not warrant higher doses of narcotics" and plaintiff had "no desire to go to CTC for instances of uncontrollable pain as he view[ed] this as punitive and isolating." (Id.) On April 30, 2009 plaintiff filed a second level of appeal saying that "Dr. Rowe was the one who was hostile and trying to out talk me. My constant high level of blood pressure is the reason my life is in danger here because you are not treating me the same." (Opp., Ex. A at 61.)

//
//

8

**DISCUSSION**

**I.     Standard of Review**

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. Id. If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323.

**II.    Claims**

Plaintiff alleges that (1) Claire Williams M.D. forced him off of methadone, and instead prescribed him Tylenol #3, which was then decreased by Sheryl Skinner, F.N.P.; (2) he was denied any medical treatment by Murray on three occasions and by J. Cross R.N. on one

9

occasion; and (3) Michael Sayer Chief Medical Officer denied him medical treatment and transfer back to San Quentin State Prison for proper medical treatment. (Compl. at 3.)

The Eighth Amendment requires that prison officials provide all prisoners with medical care. See Farmer v. Brennan, 511 U.S. 825, 832 (1994); DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 199–200 (1989); Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982). A prison official violates the Eighth Amendment when two requirements are met: (1) the deprivation alleged must be, objectively, sufficiently serious, see Farmer, 511 U.S. at 834 (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)), and (2) the prison official possesses a sufficiently culpable state of mind, i.e., the offending conduct was wanton, id. (citing Wilson, 501 U.S. at 297).

In determining whether a deprivation of a basic necessity is sufficiently serious to satisfy the objective first component of an Eighth Amendment claim, a court must consider the circumstances, nature, and duration of the deprivation. The more basic the need, the shorter the time it may be withheld. See Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000).

Plaintiffs seeking relief must show that the defendants were deliberately indifferent to their serious medical needs. See, e.g., Farmer, 511 U.S. at 834 (inmate safety); Estelle v. Gamble, 429 U.S. 97, 104 (1976) (inmate health). Neither negligence nor gross negligence will constitute deliberate indifference. See Farmer, 511 U.S. at 835–36 & n.4. A prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the standard for criminal recklessness is met, i.e., the official knows of and disregards an excessive risk to inmate health or safety. Id. at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. See id.

Applying these principles to the instant case, the Court concludes that plaintiff's claims against the medical personnel are appropriate for summary judgment. The parties do not dispute that plaintiff was in pain, that he received medical treatment, and that he refused further medical treatment at various times. The parties do dispute whether the medical treatment was

10

constitutionally adequate and whether not receiving stronger pain medication was a violation of plaintiff's Eighth Amendment rights.

### A. Claim One against Defendants Williams and Skinner

Plaintiff has failed to establish either Farmer element with respect to Williams and Skinner. First, the record indicates that the alleged deprivation of the basic necessity of medical care was not objectively sufficiently serious — there was a difference in opinion about what the treatment should be, not a substantial deprivation of treatment itself. It is undisputed that the medical professionals at PBSP declined to give plaintiff methadone for his pain. While plaintiff may have experienced pain during withdrawal and throughout his stay, the use of other pain medications and alternative treatments cannot be called a substantial deprivation, especially considering that plaintiff refused some treatments and medications and that he did in fact receive appropriate medical care. Second, plaintiff has not established that the medical personnel acted with deliberate indifference. When plaintiff first arrived at PBSP, Williams did take plaintiff off of methadone, but prescribed the alternative pain medication of Tylenol #3. Skinner continued plaintiff on Tylenol #3 and added amitriptyline. According to plaintiff's own statements, he was given pain medications, saw a pain specialist, and was recommended physical therapy. Plaintiff also indicates that he chose not to complete physical therapy or take the amitriptyline prescribed to him.

Moreover, the only apparent factual dispute in the case against Williams and Skinner is a difference of opinion between plaintiff and the defendants. "A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim." Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981). Similarly, a showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference, see Toguchi v. Chung, 391 F.3d 1051, 1058. In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the

1 doctors chose was medically unacceptable under the circumstances and that he or she chose this
2 course in conscious disregard of an excessive risk to plaintiff's health. Id. at 1058.  Here,
3 plaintiff cites as evidence of defendant's medical indifference that other physicians had
4 prescribed him, or continued him on, methadone.  However, plaintiff does not show that the
5 course of treatment, such as the Tylenol #3, amitriptyline, physical therapy, injections, and
6 routine appointments along with a visit to a specialist, and x-rays and an MRI, was medically
7 unacceptable.  In addition, there is no evidence that Williams and Skinner chose this in
8 conscious disregard of an excessive risk to plaintiff's health. Instead, the medical chart indicates
9 that the medical personnel at PBSP tried different methods to relieve plaintiff's pain without
10 resorting to methadone.

### B. Claim Two against Defendants Murray and Cross

Plaintiff also has failed to establish either Farmer element with respect to defendants Murray and Cross.  First, the record indicates that the alleged deprivation of the basic necessity of medical care was not objectively sufficiently serious — there was a difference in opinion about the urgency of plaintiff's medical needs on several days, not substantial deprivation of the treatment itself.  It is undisputed that Murray and Cross did not instantaneously send plaintiff to see a medical doctor.  While plaintiff believed that he required immediate treatment by a physician, both defendants Murray and Cross communicated with plaintiff that he would be placed in line to see a primary care provider.  On the days that plaintiff cites where he was denied medical treatment he was given trigger point injections, was scheduled for appointments with a primary care provider, was given additional pain medication, was given additional blood pressure medication, and was monitored for high levels of blood pressure.  While plaintiff believes that this treatment was not sufficient, this medical care was objectively sufficient to treat plaintiff on those occasions.  Far from denying plaintiff any medical care, Murray and Cross observed, monitored, and documented plaintiff's health and helped plaintiff schedule appointments with a primacy care provider.  Second, plaintiff has not established that the

12

1 medical personnel acted with deliberate indifference. When plaintiff saw defendants Murray and
2 Cross with complaints of pain, he was examined and scheduled for further appointments.
3 According to plaintiff's own statements, Murray could not have prescribed narcotic pain
4 medication anyway.  It appears that Murray and Cross provided the care that they could, fully
5 documented visits on the dates in question, and recommended plaintiff to see other medical
6 professionals if necessary.

### C. Claim Three against Defendant Sayre

Finally, plaintiff has failed to establish either Farmer element with respect to Sayre. First, the record indicates that the alleged deprivation of the basic necessity of medical care was not objectively sufficiently serious. It is undisputed that Sayre was the Chief Medical Officer at PBSP, he never saw plaintiff, and that under his supervision plaintiff was not prescribed methadone by health care providers and was not transferred back to San Quentin State Prison. Plaintiff's main complaint against Sayre is that he "signed all the grievances that [plaintiff] filed concerning [these] issues. He denied them." (MSJ, Decl. Stocker, Ex. A at 64.)  However, defendant Sayre did grant some partial relief in plaintiff's complaints. In addition, for all of the reasons cited above, the medical care that plaintiff received was not objectively insufficient and therefore, Sayre did not deprive plaintiff of the basic necessity of medical care by approving the treatment plan of the primary care providers. Second, plaintiff has not established that Sayre acted with deliberate indifference. Plaintiff alleges that "Dr. Sayre knew very well that the [p]laintiff should continue methadone." (Opp. at 4.) This is a conclusory statement and plaintiff has not provided, nor is the Court aware, of any evidence in support of this statement. Plaintiff also alleges that defendant Sayre instituted a blanket policy denying all inmates access to methadone while at PBSP. (Id.)  However, the only evidence plaintiff cites in support of this claim is that defendant Williams did not prescribe him methadone and that there was a "statement by [d]efendants that [p]laintiff was incarcerated at PBSP and did not deserve treatment." (Id.) However, there is no further evidence of what defendant made this statement or in what context. This is not enough to show that Sayre acted with deliberate indifference,

13

particularly in that he did partially grant some of plaintiff's filings for changes in medical treatment, including an increase in pain medication and a continuance of pain medication.

## CONCLUSION

Plaintiff having failed to show that there are triable issues of material fact, defendants' motion for summary judgment (Docket No. 20) is GRANTED as to all claims against all defendants, who are entitled to judgment as a matter of law.

This order terminates Docket No. 20.

The Clerk shall terminate the pending motion, enter judgment in favor of defendants, and close the file.

**IT IS SO ORDERED.**

DATED: August 27, 2010

SUSAN ILLSTON
United States District Judge